Common Pleas Court of Hamilton County.

THE OCTOGRAPH ENGRAVING CO., ET AL. V. HOWARD N. RAGLAND, ASSIGNEE OF JOHN B. SWIFT.

Decided December 7, 1932.

*Hunt, Bennett & Utter; Harry Neal Smith; Fred L. Maier; John P. Goldberry; Peck, Shaffer & Williams; Fred Weiland; Paxton & Seasongood; Leslie, Herman & Ritchie; Chas. E. McCarthy; Anthony B. Dunlap; Robert C. Porter; Leo. B. Meyer; Cobb, Howard & Bailey; C. M. Price; Carl Phares; Ernst, Cassatt & Cottle; Heintz & Heintz; Cohen, Mack & Hurtig; Taft, Stettinius & Hollister,* for plaintiffs.

*Wm. R. Collins* and *Howard N. Ragland,* for assignee.

MATTHEWS, J.

The plaintiffs in these cases had claims against John B.

Swift, who made an assignment for the benefit of creditors on April 22, 1931, to the defendant, who duly filed the deed of assignment in the Probate Court of this county and is now engaged in administering said estate. The plaintiffs within the time prescribed by law presented duly authenticated proofs of their respective claims to the assignee, who because of doubt as to their provability in whole or in part, rejected them, and these actions seek to compel their allowance. They were heard together in this court, at which time it was disclosed that, based on the questions involved, they can be classified as follows:

1. Some of the plaintiffs presented claims upon notes secured by corporate stock pledged as collateral which they had not, at the time of filing proof with the assignee, nor at the present time, sold to satisfy the indebtedness secured thereby. They have collected dividends declared on the corporate stock which they admit should be applied as a payment upon the indebtedness, thereby reducing it to that extent as a basis upon which the assignee should calculate the dividend from the assigned estate. It is admitted that the collateral could not be sold at this time for an amount sufficient to satisfy the indebtedness to which it is collateral.

The question presented in this class of these cases is whether or not these claims are provable for their full amount, notwithstanding the collateral personal property held as security, or whether their claims must be diminished by the value of such security. There is also involved the question of the date—whether time of the assignment or time of order of distribution—upon which the rights of creditors are fixed.

2. Some of the plaintiffs have claims secured by mortgage upon real estate. One of the claims is upon a note of which John B. Swift is an endorser. The note contains a waiver of presentment, demand protest and notice, and it is admitted that John B. Swift's liability was absolute upon the note at the time of the assignment. The other claim arises out of an agreement made by John B. Swift at the time he became the owner of the premises mortgaged to pay the mortgage indebtedness. The terms of the indebtedness are such that John B. Swift became abso-

lutely liable to pay on maturity without any demand upon him or the mortgagor and without the exercise of any diligence on the part of the creditor in pursuing his remedies against either the mortgagor or the mortgaged property.

These plaintiffs have not pursued their remedies against the mortgaged property. The question presented in these cases is whether or not the claimants are entitled to prove for the full amount of their claims, or whether the claims must be reduced by the value of the real estate security held by them. There is also the question of the date upon which the rights of these claimants are fixed.

As the same principles apply to both class one and two, they will be considered together.

3. John B. Swift was president, director, largest creditor and owner of substantially all of the capital stock of the Cincinnati Art Publishing Company, a corporation located in this city. It was in financial difficulties and effected a composition negotiated by John B. Swift with its creditors whereby they surrendered 25% of the par value of their claims and for the remaining 75% accepted notes endorsed by John B. Swift before delivery, payable in one, two and three years after date.

The claims of some of these plaintiffs are upon some of these notes which fell due on December 30, 1931, after the assignment was made and some upon notes which do not fall due until December 30, 1932. On May 4, 1931, the defendant, as assignee for the benefit of the creditors of John B. Swift, filed an action in this court (No. A-28078 upon the docket thereof) against the Cincinnati Art Publishing Company, and in his petition he set forth the facts relating to the assignment made to him by John B. Swift for the benefit of creditors and alleged that John B. Swift at the time of his assignment for the benefit of creditors was an accommodation endorser for said company in a large sum of money; that said company was not making any effort to pay off or discharge its notes upon which John B. Swift was accommodation endorser; that the defendant's property was in great danger of being lost, removed and materially injured to the irreparable damage of the assignee of John B. Swift; that the creditors of

the Cincinnati Art Publishing Company were demanding payment, threatening suits; that there was great danger of multiplicity of suits resulting in the sacrifice of the property of the company and an unfair advantage to some creditors; and praying that the defendant be compelled to pay off and discharge the obligations upon which John B. Swift was accommodation endorser, and save said assignee harmless; that the court administer the assets of said corporation as a trust fund; that a receiver be appointed to take charge of the property for the benefit of its creditors and stockholders, with authority to collect all claims due the corporation, and that all persons be enjoined from levying upon, attaching or interfering in any way with the property of the defendant corporation, and for all other relief.

On the same day that the petition was filed the court made a finding that the allegations of the petition were true and that it was necessary that the court administer the assets as prayed for, and thereupon a receiver was appointed and the corporate officers ordered to transfer all the assets of the corporation to the receiver and all persons were restrained from in any way interfering with said receiver in the performance of his duties.

On May 4th, 1931, the court made an order in that case requiring all creditors to file their claims on or before June 8, 1931, or be forever barred from participating in the distribution of the assets of the Cincinnati Art Publishing Company, and notice by publication was given of the asking of such order. On June 15, 1931, the receiver filed a report showing all creditors and the amount of their respective claims. All these claimants holding notes endorsed by John B. Swift were listed as creditors. The total debts reported were $1,353,828.90, and later the court directed that May 4, 1931, should be the date to which interest should be calculated on claims that had matured at that time and discount taken on non-interest bearing notes which had not then matured, which included these notes endorsed by John B. Swift.

The receiver has been in possession of the assets of the Cincinnati Art Publishing Company ever since his ap-

pointment and has paid a dividend of three per cent upon all proven claims, including these, upon the above stated basis. Any additional dividends from the assets of that company will not exceed one per cent.

Some of these plaintiffs who held these composition notes did not present those that matured on December 30, 1931, for payment, and give notice of dishonor to John B. Swift or his assignee. The questions presented are:

(a) Whether demand for payment and notice of dishonor was necessary in order to fasten a liability upon John B. Swift and his assigned estate;

(b) If notice of dishonor is necessary, should it be given to the assignee or to the assignor?

(c) Whether the claims upon these unmatured notes are of such a character that they are provable against the assigned estate under the laws of the state of Ohio.

CLASSES 1 AND 2.

It would be difficult to find any subject in the law on which the courts, in the absence of specific statutes on the subject, have disagreed more than upon this question of the basis upon which dividends should be declared upon secured claims against an insolvent estate in process of administration. The cases are collected in an elaborate annotation to the case of *Citizens & Southern Bank* v. *Alexander, Receiver of Irish American Bank*, L. R. A., 1918 B, 1021 at 1024, *et seq.* The author of the annotation adoptes for his classification of the cases the four different rules found in the cases as set forth in *Merrill* v. *National Bank*, 173 U. S., 131. The rules are:

1. That the creditor desiring to participate in the fund is required to exhaust his security and credit the proceeds on his claim or credit its value upon his claim and prove only for the balance.

2. That the creditor can prove for the full amount but shall receive dividends only on the amount due him at the time of distribution of the fund, having credited all sums received from his security up to that time.

3. That the creditor shall be allowed to prove for and receive dividends upon the amount due him at the time of proving his claim.

4. That the creditor can prove for and receive dividends

upon the full amount of his claim regardless of any sums received from his collateral after the transfer of the assets from his debtor in insolvency, provided he shall not receive more than the full amount due him.

It will be found by an examination of the annotation that the first rule is supported by as great, if not greater, an array of cases as any of the other rules. The annotator says:

"In the absence of statutory provisions there is much authority to the effect that a creditor holding collateral security and desiring to participate in the distribution of the general assets of his insolvent or bankrupt debtor must first exhaust his security and credit the proceeds on his claim, or credit its value upon his claim and prove for the balance, it being optional with him to surrender his security and prove for his full claim."

The author places Ohio in this class, and at pages 1034 and 1035 says:

"So, under the Ohio statute (Swan & S. Statute, p. 709, paragraphs 10 and 13), which provides that dividends shall be applicable to 'balances of claims equally among all creditors,' and that, before claimants are entitled to an allowance of or payment on their claims, they must make affidavit as to what security, if any, they hold, and that claimants may be examined under oath regarding the same, it being ruled that the policy of the law is clearly to require collateral to be exhausted or applied before allowing claimants a dividend. And again, under Ohio Rev. Statute No. 6356, and the accompanying sections, it has been declared that secured creditors must apply their security and then share equally in the balance of the assets with the general creditors, the court taking the view that the statute nowhere seemed to contemplate a dividend in which secured and general creditors, as such, should share, but that the secured creditors must become general creditors by exhausting their security in order to participate in the general assets."

At the head of the list of cases supporting the so-called chancery or equitable rule (the fourth rule in the classification) are the cases of *Bank* v. *Armstrong*, 59 Fed. 372, decided in 1893, and *Merrill* v. *Bank*, 173 U. S. 131, decided in 1899. These cases, as the annotator points out, apply this rule in the absence of any statutory provision more

specific than a direction for a ratable or pro rata distribution. They are, therefore, inapplicable as guides where statutes exist indicating a different basis of distribution. Even in such a situation the compelling authority that ordinarily attaches to a decision of the Supreme Court of the United States is lessened in this case by the fact that four of the Justices dissented and voiced their dissent in opinions containing reasoning equally cogent with that contained in the majority opinion.

Without therefore seeking further to gain light from decisions of courts outside this state, I will turn to a consideration of the statutes and decisions in this state. Of course, the legislature has power to fix prospectively the rights of creditors in or against the assets of an assigned estate. No constitutional question could arise excepting as to creditors existing at the time the law was passed. Our present statute, with certain clarifying changes in verbiage, has existed for a century. There is, therefore, no constitutional question involved and our sole task is to ascertain the legislative intent, if any is expressed.

Sections 11029 to 11180, both inclusive, Chapter 6 of the General Code, constitute the statutory law of Ohio applicable to insolvent debtors, including general assignments of all the debtor's property for the benefit of creditors. The right to name the liquidator is given to the debtor in the first instance, but if he proves unsatisfactory, the creditors are authorized to elect a trustee to displace him. For the purpose of this election the Probate Court is given jurisdiction to determine who are creditors and the amount of their claims, but such determination is for the purpose of the election only. By certain sections the legislature has provided for the appointment of receivers for the administration of insolvent estates, these instances being in those cases in which there has been a transfer with intent to hinder, delay or defraud creditors, and by Section 11106, General Code, it is enacted that the trust shall be administered by the receiver *"for the equal benefit of all creditors as in other cases of assignments to trustees for the benefit of creditors."* And by the same section provision is made for the institution of an action by an assignee to set aside conveyances made to hinder, delay

or defraud creditors, and in such instances the property recovered shall be administered by him *"for the equal benefit of all creditors as in other cases of assignments to trustees for the benefit of creditors."*

Provision is made by Section 11134, General Code, for the presentation of claims within six months after publication of the notice of appointment, and by Section 11137, General Code, an affidavit in proof of claim is required, and in this affidavit the claimant must set forth "that the claim is just and lawful, the consideration thereof, and what, if any, setoffs or counterclaims exist thereto; what collateral or personal security, if any, the claimant holds for the claim, or that he has no security". The right of the assignee or any creditor to examine the claimant relating to his claim is given by the section.

The only other pertinent section is 11141, General Code, by which it is enacted that:

"When on settlement a balance is shown in the hands of the assignee or trustee, *subject to* distribution among the *general creditors,* a dividend shall be declared by the probate judge payable therefrom equally among all the creditors entitled in proportion to the amount of their respective claims against the assignor."

Running through all of these legislative expressions is found the idea that the administration of the insolvent estate shall be for the equal benefit of all the creditors, and by Section 11141, General Code, provision is made for the distribution of the balance in the hands of the assignee, as shown by the report previously made. This report according to Section 11140, General Code, is to be treated in a manner similar to the accounts filed by administrators and executors. Such report, therefore, will show in an appropriate case a balance held by the assignee for distribution.

It can been seen from Section 11141, General Code, and the preceding sections, that the main purpose of the administration is to bring the estate into such condition as to enable the assignee to report a balance subject to distribution, and that that balance, which is the administrative object, is to be distributable among *general creditors.*

Now, what is meant by general creditors? It will be

found that general creditors is the antonym of secured creditors. *King* v. *Frazer*, 23 S. C. 543: *Noyes* v. *Chapman, Drake Company*, 60 Minn. 88: *Reid* v. *Allen*, 183. Ala. 582.

As the statute says that the fund is subject to distribution among general or unsecured creditors, it seems clear that the distribution would naturally follow to such creditors to the exclusion of the secured creditors. Being subject to, that is, under the contingency of, dependent upon, or exposed to, distribution among the unsecured creditors, it would seem to be a clear departure or diversion from the purpose to distribute it to any other class. It therefore seems to me that the statutes of Ohio are reasonably clear that until a creditor can bring himself within the class of unsecured creditors he is not entitled to participate in a fund that is "subject to distribution among general creditors". The decision of the lower courts of Ohio are in conflict upon this subject. The case of *Jelke* v. *Stallo, Assignee*, 1 N. P. 29, followed the reasoning of the case of *Bank* v. *Armstrong*, 59 Fed. 372, and held that a secured creditor could prove for the full amount of his claim as it existed at the time of the assignment. The court did not make an analysis of the Ohio statutes to determine whether or not they required a different conclusion.

In *Searle* v. *Brumbach, Assignee*, 4 W. L. M., 330, an Ohio district court analyzed the statutory law on the subject and came to the conclusion that a creditor holding a real estate mortgage as security was required to reduce the amount of his claim by the agreed value of the security, and that the balance was the basis upon which the dividend should be declared. At page 331 the court said:

" But in our opinion, the question made in this case is settled by the statute regulating the mode of administering assignments in trust for the benefit of creditors— Swan & C. Stat. 709, *et seq.* By the 13th section of this act, before claimants are entitled to an allowance of, or payments on, their claims, they must make affidavit that the claims are just and lawful, or what collateral or personal security, if any, they hold for the same, or that they have no security; and the assignee, or any creditor,

has the right to examine such claimants, under oath, touching any such collateral or other security, or any other matters relating to said claims. It can not be that all of this is an idle form and empty ceremony; that the information for obtaining which such adequate means are provided shall not avail anything, or affect the administration of the trust. Evidently, the legislature contemplated some substantial benefit or advantage from all this. We know of no good reason for requiring such an affidavit and showing as to securities, unless it was to enable the assignee to require claimants to account for, or apply such securities before receiving payments out of the trust funds."

In the case of *In Re Spence, Assignor,* 4 N. P. 439, the Probate Court of Clarke County, (Rockel, J.) the same result was reached as in the case of *Searle* v. *Brumbach, supra.*

In the case of *Bank* v. *Esterly,* 69 O. S., 24, the court in its opinion analyzed the insolvency laws of Ohio for the purpose of determining by analogy the proper basis of distribution in a receivership case. The exact point decided was that security upon which the creditor had realized at any time before a dividend was declared must be credited upon the entire claim and a dividend paid only on so much of the debt as remained after deducting the proceeds of the collateral. The court, after referring to *Merrill* v. *Bank* and *Bank* v. *Armstrong, supra,* and expressing dissent from their reasoning, had this to say at pages 35 and 36:

"In cases of assignment under our insolvent laws, the legal title of the property of the assignor passes to the assignee, in trust for the benefit of, not some, but *all* creditors of the assignor. The unsecured creditor is as fully represented by that title as is he who holds collateral security for his claims, and if he becomes the equitable owner of such 'a proportional part of the whole as the debt due him is of the aggregate of the debts', his equitable title is not weakened nor his equitable joint share decreased by the fact that another creditor has security for all or part of his claim. But to allow a dividend to the secured creditor on the basis of his entire claim unreduced by collected collaterals, would diminish the share of the general or unsecured creditor in the estate of the insolvent debtor. In other words, to pay a dividend

on more than is actually due on a secured claim will unjustly reduce the general fund in which the unsecured creditor is entitled to share."

And at page 37, after quoting the provisions of the statute imposing the terms of the affidavit in proof of claim, said:

"The making and filing of this affidavit is not optional with the creditor, but it is essential to the proper allowance of his claim, and it proceeds upon the evident policy of the law, that the affidavit will truthfully disclose both the nature of the claim and its condition. * * *"

And at page 38:

"And we think that this information as to the condition of the claims is to be furnished so that a dividend may be made on equitable principles, because whatever amount a secured creditor receives beyond what is actually due him after application of money realized from collaterals, or after allowance of admitted offsets, must be taken from the general fund and therefore from the general creditor."

It is urged, however, that in the case of *Assets Realization Company* v. *Bonding Company*, 88 O. S. 216, the Supreme Court held that a secured creditor was entitled to a dividend on the full amount of the claim without having first credited thereon the amount of unrealized security. The facts in that case are very involved and unusual. The city of Cleveland had deposited money in the assignor bank and had given eight bonds for specific amounts, each bond being signed by one surety company to indemnify the city against loss, the liability on each bond being limited to such proportion of the total loss sustained by the obligee as the penalty named in each bond bore to the total amount of the bonds furnished by the principal. For the purpose of developing the point material in this inquiry it can be assumed that the city held no collateral and that its affidavit in proof of claim averring that fact was true. After the city proved its claim against the assigned estate, the bonding companies paid the city the amount of its deposit and took from the city separate partial assignments of the claim proven against the insolvent estate, each bonding company thereby be-

coming the owner of its proper share of the total claim proven by the city. Afterwards the Assets Realization Company purchased all the property of the assigned estate under an agreement approved by the Court of Insolvency whereby as consideration it agreed to pay to the assignee on demand such additional sum as would be necessary to enable to assignee to pay a dividend of 50% on the face amount of all claims of general creditors theretofore presented and allowed. It so happened that two of the bonding companies held certain security given to them by the insolvent bank to indemnify them against loss on their bonds. An action was begun in the Common Pleas Court by certain of the bonding companies to recover the dividends upon their shares of the claim of the city which it had assigned to them. All the other bonding companies, the assignee and the purchaser of the assets were made, or became, parties to the suit. The real issue in the case was what amount the purchaser of the assets was required to pay under the terms of its agreement of purchase. At page 259 the court said:

"The other collateral which the plaintiff in error would have applied in reduction of the city's claim was not in the hands of the city, but was held by the two secured companies. The city, as we view it, had the right to present its claim to the assignee for allowance and could have collected from the assignee all dividends thereon before taking any step to enforce its claim on the several bonds, and we do not think that the rule in the Esterly case is applicable to the collateral in question, and the circuit court was correct in making the order for the payment of a dividend on the amount of the claim of the city, as allowed, without applying the collateral in the hands of the two companies in reduction thereof."

It will be observed that the court referred to the Esterly case and simply held that the rule there enunciated was not applicable to the collateral in the hands of the bonding company. It seems clear that the reason the court so stated was that while the city had a remedial right to subject such collateral to the payment of its claim, it was not security *held* by the city. It was a part of its remedy against a surety of the assignor, and as it is clear that a claimant is not required to pursue and exhaust a surety

or co-debtor before proving his claim, that therefore the fact that this surety held collateral, which under equitable principles the creditor could insist upon his holding for his benefit, did not place the creditor in the position of one itself holding security.

By an examination of the brief filed by the secured bonding company it is disclosed that they call the attention of the court to cases in those jurisdictions where the equitable or chancery rule is applied which hold that notwithstanding that rule a creditor with a secured surety may prove and receive dividends on his whole debt.  These cases are *Meed* v. *Nelson,* 9 Gray (Mass.) 55; *Provident Institute* v. *Stetson,* 12 Gray (Mass.) 27; *Hale* v. *Leatherbes,* 175 Mass. 547; *Viles* v. *Harris,* 130 Mass. 300.

Our Supreme Court seems to have considered that the purchaser of the assets of this insolvent bank was not entitled, under the terms of his contract of purchase, to insist that the city pursue the sureties and the collateral in their hands before proving its claim against the assigned estate, that its affidavit in proof, averring that it had no collateral, was true, and that therefore the purchaser would have been required to pay to the assignee an amount sufficient to enable him to declare a dividend of 50% upon the total claim of the city as proved, and that the fact that the bonding companies had paid the city and taken assignments of its claim did not alter the rights of the parties under the contract.  It therefore seems to me that it cannot be said that the case of *Assets Realization* v. *Bonding Company* is an authority holding that a creditor holding securities is entitled to prove for the full amount his indebtedness, receive dividends thereon, and is not required to place himself in the position of an unsecured creditor before receiving a dividend and then only for the unsecured amount.

That the point in the case was really the question of the amount to be paid by the purchaser under the peculiar terms of his contract is shown by the language of the court at page 260:

"We do not think there is any merits in this contention and it cannot be adopted.  Under its contract of purchase, plaintiff in error agreed to pay to the assignee of the depositary an amount sufficient to pay a dividend of

fifty per cent. On the face amount of all allowed claims, and this, in effect, was an obligation to pay the assignee, for and on behalf of the bonding companies, the holders of the allowed claim of the city, and the other general creditors—the contract was one for the benefit of these parties—and the bonding companies, as such beneficiaries, were in position to enforce their rights under this contract in this action, and this relief is sought by them in their pleadings."

I am therefore of the opinion that the Ohio rule is, as shown by the terms of the statute and by the weight of the Ohio authorities construing the statute, that before a secured creditor can be paid a dividend from the "fund subject to distribution among the general creditors," he must either realize upon his security, or have its value fixed, so that the extent to which he is a general creditor may be determined and to the extent only that he is a general creditor does he come within the designation of the class to which the fund for distribution equally among the general creditors can be paid.

For the purpose of the distribution contemplated by the statute, it seems clear that the date upon which the rights of the parties are fixed is the date of distribution as determined by the court in the process of administration. This was the decision in *State* v. *Esterly, supra,* and is the date ordinarily applied in administration suits, in the absence of a statute prescribing a different rule. Clark on Receivers, 2d Ed., 446; *Baker* v. *Herrlinger,* 16 Ohio App. 353.

## CLASS 3.

It seems to me on general principles that the rule requiring demand upon the maker and notice to the endorser can not apply in the situation presented by the facts in this case. On the petition of the defendant all the assets of the maker corporation had been placed in the custody of the law to be administered for the benefit of all persons having claims and all persons had been enjoined from interfering with the possession of the assets by the court's officer. Long before any of these notes had matured they had been allowed and the basis of their participation in the assets judicially determined. Before ma-

turity of the notes the defendant had compelled these claimants to become parties—although not of record—to litigation to prove their claims for the purpose of receiving dividends or be forever barred from participation in any of the assets owned by their debtor. The receivership embraced all the debtor's assets. Nothing was withheld. The debtor, being a corporation, had no prospect of acquiring assets or credit from which these claimants could hope to realize on their claims. The claimants had but one alternative. It was prove or get nothing. The defendant in these cases placed them in that position. They proved, and, in effect, the maturity of the notes was precipitated by discounting them as of May 1st, 1931. All this seems to me to clearly show a waiver by the defendant not only of demand but also of notice of dishonor.

By Section 8187, General Code, it is provided that:

"Presentment for payment is dispensed with.  *  *  *  3—By waiver of presentment, express or implied."

And by Section 8206, General Code, it is enacted that:

"When a party has been adjudged a bankrupt or an insolvent, or has made an assignment for the benefit of creditors, notice may be given either to the party himself or to his trustee or assignee."

These sections are part of the Uniform Negotiable Instrument Code and supersede any and all conflicting case law existing at the time of its passage. The Uniform Negotiable Instrument Code has been enacted in every state in the Union and the cases construing the sections identical with Sections 8187 and 8206, General Code, are collected in Brannan's Negotiable Instruments Law (5th Ed.) at page 796, et seq. and 839 and 840. Being of the opinion that the demand for payment and notice of dishonor were waived by the person having the right to insist upon such requirements, it is unnecessary to decide whether or not John B. Swift was the accommodated party in these note transactions.

The claims on the notes, matured and unmatured, are allowed as proven.

Judgment entries in these cases in accordance with this opinion may be presented.